UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   22-CR-80208-CANNON

UNITED STATES OF AMERICA,

vs.

DANIEL CLARK,
                    Defendant.
_____/

## DANIEL CLARK'S SENTENCING MEMORANDUM

Undersigned counsel hereby offers this Sentencing Memorandum on behalf of Daniel Clark to assist the Court in reaching a fair and just sentence. It is not being offered to the Court in any way to justify Mr. Clark's actions, but simply to describe some of his life circumstances that may have contributed to the decisions he made that brings him before the Court.

## PAIN

Daniel Clark has led a life defined by pain; both physical and emotional. The physical pain came early by way of a series of medical issues, most of which are catalogued in the PSI: hernia surgery at age three; ocular albinism which made him extremely sensitive to light and resulted in frequent migraine headaches from the age of four; a diagnosis of strabismus at age five which required corrective surgery and necessitated an eye-patch which provoked merciless teasing from his class mates. While still only five, he developed serious asthma-like symptoms that

required frequent trips to the emergency room, regular gamma globulin injections and the use of a nebulizer at home.

Suffering from constant headaches, unable to tolerate sunshine and forced to wear an eye-patch, it is no wonder that the young Daniel soon became socially awkward and withdrawn. By the age of twelve, Daniel was diagnosed with depression and anxiety. At thirteen, he was prescribed Ritalin for Attention Deficit Disorder (ADD).

To this day, Daniel Clark remains plagued with physical pain. His migraines are incessant, he has ulcers and a bad back. He also continues to struggle with depression and anxiety.

## LYMAN WARD MILITARY ACADEMY

About the time Daniel was diagnosed with ADD and prescribed Ritalin, his mother was diagnosed with breast cancer. While seeking treatment for her, his parents decided that the public school system simply could not meet the needs of their son. They put him into a local private school hoping for more direct teacher involvement. When the private school failed, they decided it would be best for Daniel to be sent away to a military academy. Their hope was that such a structured environment would help Daniel focus and instill some discipline in him. They chose Lyman Ward Military Academy in Camp Hill, Alabama.

In 1993, with the best of intentions, Mr. and Mrs. Clark drove thirteen-year-old Daniel to the school and dropped him off. They had no way of knowing what they had done.

Lyman Ward had an all-male student population of approximately one hundred students. Gangs were rampant on campus. Younger students were viciously brutalized by older cadets. They were routinely subjected to beatings and brutal hazing. In a lawsuit filed some years after Daniel left the school, a student described being held down while someone drilled holes into the palm of his hand. Another reported being beaten until he vomited. Daniel lived in constant fear of physical violence from the older students. But there was an even darker secret at Lyman Ward.

Walter Edward Meyer was a member of the Academy's staff during the time Daniel attended. In 1996, just three years after Daniel arrived on campus, Meyer was arrested and charged with approximately 120 counts of sexual abuse against cadets ranging in age from twelve to seventeen. Meyer was eventually sentenced to twenty years in prison.

In a jail interview, Daniel was asked directly if he had been sexually abused by Meyer. Daniel hesitated and then denied being one of Meyer's victims. However, when he did so, Daniel's facial muscles were visibly twitching and trembling. When the interviewer pointed out that he was shaking, Daniel said he was shivering from

the cold room. It should be noted that in an interview that lasted for over an hour, Daniel Clark only "shivered from cold" when being questioned about the sexual abuse at Lyman Ward Academy.

Even if Clark was not himself a victim of sexual abuse, he had to have been living in constant fear. With such wide-spread sexual and gang related violence, in a student body of only one hundred children, fear and apprehension had to be a constant companion. Daniel Clark was suffering from depression and anxiety when he arrived at the Academy. Living in that toxic environment could only have aggravated those illnesses.

## CHINA

With no prior teaching experience, Daniel was able to land a job as an English teacher in China. He went there with no ability to speak Chinese. Shortly after arriving, he learned that the Chinese nationals who had helped arrange his job expected him to marry one of their daughters and bring her to the United States. Perhaps because of his naivete, he went along with the plan. However, the marriage quickly fell apart and the couple was divorced.

Daniel loved living in China. He became fluent in Chinese. He described life there as "easier" with less focus on material things. He also gained some measure of control over his chronic migraines through traditional Chinese healing techniques.

He bought a condominium. He met his wife, Xiaolan Tang, they married and had a son, Kai. Kai was born in China.

Xiao is a doctor. She wanted to come to the United States to continue her medical studies. When she was accepted into a medical school in Tampa, the couple sold the condo and left China. Kai remained behind with Xiao's parents. Daniel left China reluctantly in 2011.

He returned a year later without Xiao. He lived with his in-laws and was, in his own words, "lost and depressed at that point." In 2014, Xiao went to China, the couple reunited and returned to the United States with Kai. They settled in Tampa.

SELF-MEDICATION AND THE DESCENT INTO THE DARK WEB

After returning to the United States, Daniel bounced around at a series of jobs. He worked for Humana as an insurance salesman for about three years. His migraines became steadily worse during that time period. Although he saw several doctors, none could provide much relief. He quit his job and basically gave up on doctors.

After leaving Humana, Daniel floundered. He tried a series of odd jobs, but nothing ever really got off the ground. He and his wife moved to Gainesville so she could continue her medical training.

In approximately 2018, Daniel, then 38 years old, reached out to Diane Zuckerman, a long-time friend of the Clark family. He asked if they could meet and

talk. Ms. Zuckerman had frequent contact with Daniel from his adolescence into adulthood. She has a B.S. degree in nursing and a Juris Doctorate. She practiced law for many years. In a letter to the Court (attached as Exhibit A) she described Daniel as "sad and uncomfortable," "socially isolated" and "chronically depressed." She observed that Daniel was always a round peg trying to fit into a square hole. She described Daniel as "extremely naïve."

During their meeting, Daniel spoke of having marital difficulties and suicidal thoughts. Ms. Zuckerman became so alarmed that she telephoned Daniel's parents. They were in a restaurant and informed Ms. Zuckerman that Daniel often threatened suicide.

Determined to do something, Ms. Zuckerman persuaded Daniel to let her take him to the hospital to see if he could get some relief for his migraines. Once there, she informed the staff of his suicidal threats. Daniel was involuntarily committed as a danger to himself under Florida's Baker Act.

Plagued by depression, anxiety and migraines, Daniel started spending more and more time on his computer at home. Seeking relief from his migraines, he discovered many different types of medicines available for purchase without a prescription on-line from what purported to be an on-line pharmacy. These medications were available far cheaper than at American pharmacies. He also

6

discovered that the Dark Web was a veritable open-air market for any and all types of drugs—both legal and illegal. People buy and sell in complete anonymity.

Daniel ordered medications he had been prescribed in the past and began self-medicating. The drugs were delivered in blister-packs just like the pharmaceuticals in any CVS or Walgreen's, but from a pharmacy in India. He tried them, they seemed to work like the drugs he bought with a prescription. Daniel saw a business opportunity.

He ordered pharmaceuticals he was familiar with. The packages arrived from India. Clark would then sell them on the web. He was placing orders approximately every two weeks or so.

At some point, U.S. Customs inspected and seized a package from India addressed to Daniel. Customs sent Daniel a letter revealing the seizure and explaining Daniel's options. One of the options allowed Daniel to deny any knowledge or ownership interest in the package and to consent to the seizure. Unsure what to do, Daniel contacted the supplier in India. He was told not to worry, that Customs often seized shipments. He was instructed to simply deny any knowledge of the package or its contents. The pharmacy even replaced the drugs that were seized at no charge to Daniel.

## YOU WORK FOR ME NOW

In late June, 2021, Clark was expecting another delivery of drugs. However, when he opened the package, instead of medications, he found the business card of a detective from the Suwannee County Sheriff's Office. The drugs had been intercepted and seized at a post office box Clark had opened in that county. Clark knew he was being investigated. This was different from Customs. He expected the police to knock on his door and arrest him at any moment.

Panic stricken, he contacted the organization in India. He was passed up a chain of command. Finally, he was communicating with the man in charge, known to Clark only as "AK." AK explained to Clark he had nothing to worry about from law enforcement. According to AK, there was a lawyer in Miami who would "take care" of everything with the Suwannee County Sheriff.

Later, AK explained that Clark still had a problem. AK had hired the Miami lawyer. AK implied that he had also paid a bribe to the Suwannee County Sheriff. AK was holding Clark responsible for that. So, from then on, Clark was going to be working for AK. Clark would no longer be able to order pharmaceuticals from AK for resale. Instead, AK would send bulk drugs directly to Clark. Clark would also receive names and addresses of customers. Clark was expected to fill the orders and ship the packages to the customers. For this, Clark would receive a flat amount of

8

money approximately every two weeks. Clark had no say in what was sold, how much was sold, the selling price or even how much he was paid.

Since law enforcement did not soon show up at his front door, Daniel came to believe that AK did have the power to reach out from India and fix things in Florida. Daniel also came to believe that he could not say no to someone with that much power.

The nature of the merchandise changed almost immediately. Rather than pharmaceutical grade pills in factory blister packs, AK began shipping crudely pressed loose pills in bulk. Deliveries arrived for Daniel constantly. He had no idea what was coming or the amounts to expect. AK would electronically send a spreadsheet with the names and addresses of stateside customers. The spreadsheet would contain the substance and the amount ordered. Daniel would be expected to count out the pills, package them up and mail them. Customers were scattered across the country from Maine to California.

AK constantly increased the amount of narcotics he shipped to Daniel. Shipments started arriving five days a week. Daniel began to feel overwhelmed. He wanted out of the business.

Daniel finally confronted AK with his desire to quit. AK made it clear that Daniel was not allowed to do that. He threatened Daniel and his family. He told Daniel he knew where Daniel's son Kai went after school. He made it clear he could

9

have Mexican Cartel members visit Daniel's home in Gainesville. Daniel described an incident where a strange car was parked outside his house. AK asked him if he wanted someone to come in and talk to him. Given that AK had apparently "fixed" things with the Suwannee County Sherriff the year before, Daniel had every reason to believe AK had the ability to follow through on his threats. Daniel continued doing AK's bidding out of fear for his family's safety.

COMPLETE COOPERATION

Daniel Clark was arrested by Task Force officers in the parking lot of a shopping center in Gainesville, Florida. He was handcuffed and placed in the backseat of a vehicle. Daniel's demeanor and appearance while sitting handcuffed reflect the depth of his depression and anxiety. He had greasy shoulder length hair and sat without moving in a fugue-like state. (See attached Exhibit B) He sat there for approximately 25 minutes before officers approached him to ask some basic background questions. Clark made it clear he would answer any questions they wanted to ask.

Less than an hour after his arrest, he was explaining the entire scenario to investigators. He explained how he got involved with AK and the coercion AK applied to keep him involved. Before leaving the shopping center he signed consent to search forms for his cell phone and provided the password. He told officers what

10

they would find in his house. He told them where to look for records that would substantiate what he was telling them.

The entire interview in the parking lot is on video. Daniel Clark repeatedly expressed fear of AK and fear for his family's safety. There can be no question that his fear was genuine, so much so that the original Assistant U.S. Attorney disclosed it as *Brady* material.

Daniel Clark's cooperation did not end that day. It took nearly a month for Daniel to be transported from Gainesville to West Palm Beach. Shortly after arriving in West Palm, he met with the government and half a dozen agents from five different agencies for a proffer.

That wide-ranging proffer lasted for approximately four hours. Daniel answered every question put to him to the best of his ability. He disclosed the web sites, bank accounts, crypto currency exchanges, computers and phones he used. He described wire transfers, checks and other payments. He provided passwords. He described how he communicated with AK. He told the agents everything he knew.

Afterwards, agents came to the Palm Beach County Jail with his laptops. They asked him to trace transactions from his crypto wallet from an account. He did.

Daniel Clark has done everything he could to assist law enforcement, including consenting to forfeiture of his personal accounts.

## AMENDMENT TO SENTENCING GUIDELINES

The defense filed no objections to the sentencing calculations contained in the PSI.   The change of plea occurred on April 26, 2023. On April 27, 2023 the United States Sentencing Commission released proposed amendments scheduled to take effect November 1, 2023. One of those amendments, §4C1.1 would have a direct impact on Daniel Clark's total offense level. If applied to Clark, his total offense level would be 27 and his advisory guideline range would be 70-87 months. Clark would qualify for the reduction were it now in effect. The Government agrees that this Court can and should apply the two-level reduction contemplated by the proposed amendment.

Taking into account the Government's recommendation of a 20% sentence reduction for Clark's cooperation (DE 43) the guideline sentencing range would be 56-69.6 months.

However, fashioning a sentence in conformance with 18 USC 3553(a) requires the Court to do more than a mathematical calculation.  Coercion or duress not amounting to a complete defense is a mitigating factor the Court can take into account at sentencing. (See Guidelines Manual §5K2.12) Likewise, mental and emotional conditions may also be relevant for mitigation. (See Guidelines Manual §5H1.3).

CONCLUSION

Daniel Clark has lived a life dominated by physical and emotional pain. He suffers from migraines, anxiety and depression. Those physical and mental issues contributed to his initial forays into illegal drug activity in a misguided effort to self-medicate. From there, it was an admittedly small step to begin illegal drug sales.

However, it is respectfully submitted that given his anxiety and depression, he was vulnerable to the coercion exerted against him by AK. Daniel Clark was simply too weak willed to stand up to, or otherwise resist, the demands of AK.

**WHEREFORE** undersigned counsel respectfully requests this Honorable Court take into account the issues presented in this memorandum as well as the recommendations made at the sentencing hearing and impose a sentence of 56 months.

Respectfully Submitted,

*/s Donnie Murrell*

_____
**DONNIE MURRELL, ESQ.**
**FLORIDA BAR NO:  326641**
400 Executive Center Drive
Suite 201—Executive Center Plaza
West Palm Beach, FL  33401
Telephone:  561.686.2700
Facsimile:   561.686.4567
Email:  ldmpa@bellsouth.net
Attorney for Defendant Clark

13

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s Donnie Murrell*

_____

**DONNIE MURRELL, ESQ.**

## SERVICE LIST

**U.S.A. vs. DANIEL CLARK**
**CASE NO:  22-CR-80208-CANNON**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Daniel Funk, Esq.
Daniel.Funk@usdoj.gov
Assistant United States Attorney
500 South Australian Avenue
Fourth Floor
West Palm Beach, FL  33401
Telephone:  561.209.1069